LUCERO, Circuit Judge.
The Oklahoma Taxpayer and Citizen Protection Act of 2007 (the “Act” or the “Oklahoma Act”) is one of a multitude of recent state enactments that regulate illegal immigration and verification of employment eligibility. This case implicates three provisions of the Act. Section 7(B) forces businesses to utilize the Basic Pilot Program to verify the work authorization status of their employees on pain of debarment from contracting with Oklahoma public employers. Section 7(C) makes it a discriminatory practice for an employer to terminate an authorized worker while retaining an employee that the employer knows or reasonably should know is unauthorized to work. Section 9 requires contracting entities either to verify the work eligibility of their individual independent contractors or withhold certain taxes from those contractors. Otherwise, the contracting entity is liable to the State for the money not withheld.
Plaintiffs, various chambers of commerce and trade associations (“plaintiffs” or the “Chambers”), challenged Sections 7(B), 7(C), and 9 of the Act. They claimed that all three sections were expressly and impliedly preempted by federal law and moved for a preliminary injunction to bar Oklahoma’s Governor, Attorney General, Human Rights Commission, and Tax Commission (collectively “defendants” or “Oklahoma”) from enforcing the challenged provisions. Defendants opposed a preliminary injunction and moved to dismiss. Oklahoma argued that the Chambers lacked standing, that certain defendants were immune from suit under the Eleventh Amendment, and that the Tax Injunction Act, 28 U.S.C. § 1341, deprived the district court of jurisdiction to enjoin Section 9. The district court denied the motions to dismiss and granted the preliminary injunction. All defendants, save the Governor, appeal.
Faced with the same issues that were before the district court, we conclude: (1) the Chambers have standing; (2) that the Eleventh Amendment precludes the case only insofar as the Attorney General is named as a defendant in the challenge to Sections 7(C) and 9; and (3) the district court properly exercised jurisdiction over the Chambers’ challenge to Section 9. We further hold that the Chambers are likely to succeed on the merits of their claims that Section 7(C) is expressly preempted and that Section 9 is impliedly preempted. Moreover, the remaining considerations favor issuance of a preliminary injunction.
Although their reasoning differs, my colleagues conclude the district court erred in its determination that Section 7(B) is preempted, and thus the panel reverses the district court’s grant of a preliminary injunction against the enforcement of Section 7(B). I dissent from the judgment of the court on this issue and would hold that Section 7(B) is impliedly preempted and that the issuance of a preliminary injunction was appropriate. Accordingly, this opinion is that of the court except with respect to sections V.B.2 and V.B.4.
We have jurisdiction under the collateral order doctrine to consider the district court’s denial of Eleventh Amendment immunity, P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 147, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993), and under 28 U.S.C. § 1292(a)(1) to review the grant of a preliminary injunction. The panel dismisses in part, reverses in part, and affirms in part.
I
This case requires us to consider the interplay between the federal employment *751 verification regime and that of the Oklahoma Act. We begin by outlining these potentially-conflicting systems.
A
Enacted in 1986, the Immigration Reform and Control Act (“IRCA”) created “a comprehensive scheme prohibiting the employment of illegal aliens in the United States.” Hoffman Plastic Compounds, Inc. v. NLRB, 535 U.S. 137, 147, 122 S.Ct. 1275, 152 L.Ed.2d 271 (2002). Section 101(a)(1) of IRCA makes it “unlawful for a person or other entity ... to hire ... for employment in the United States an alien knowing the alien is an unauthorized alien.” 8 U.S.C. § 1324a(a)(l), (a)(1)(A). An “unauthorized alien” is defined as an “alien [who] is not at that time either (A) ... lawfully admitted for permanent residence, or (B) authorized to be so employed by [IRCA] or by the Attorney General.” § 1324a(h)(3).
Federal law exhaustively details a specialized administrative scheme for determining whether an employer has knowingly employed an unauthorized alien.[1] § 1324a(e). An employer that does so is subject to a range of civil and criminal penalties, including fines, § 1324a(e)(4), cease and desist orders, id., and imprisonment, § 1324a(f)(l). Consistent with its comprehensive nature, IRCA includes an express preemption provision: “The provisions of this section preempt any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens.” § 1324a(h)(2).
IRCA also establishes an “extensive ‘employment verification system,’ designed to deny employment to aliens who (a) are not lawfully present in the United States, or (b) are not lawfully authorized to work in the United States.” Hoffman Plastic, 535 U.S. at 147, 122 S.Ct. 1275 (citations omitted). Known as the 1-9 system, employers are required to verify the identity of their employees and ensure they are eligible to work in the United States by examining certain specified documents. 8 C.F.R. § 274a.2(b). IRCA establishes a list of permissible verification documents, enabling employees to prove eligibility by supplying any document on the list. 8 U.S.C. § 1324a(b)(l)(A)-(b)(l)(D). An employee who submits verification documents that “reasonably appear[] on [their] face to be genuine” may not be required to produce different or additional documents if such requests by employers are made for the purpose or with the intent of discriminating. §§ 1324a(b) (1) (A) (ii), 1324b(a)(6). Federal law further defines the class of individuals who must verify employment eligibility, requiring verification for employees but not for independent contractors. See § 1324a(a)(l)(A); 8 C.F.R. § 274a.l(f) (excluding “independent contractor” from the definition of “employee”); § 274a.l(g) (employers not responsible for verifying work authorization of independent contractors).
Congress opted to create a substantial safe harbor for employers that comply with the 1-9 system. 8 U.S.C. § 1324a(b)(6)(A). Unless an employer persists in violating IRCA after being put on notice of its noncompliance or engages in a pattern or practice of violations, § 1324a(b)(6)(B), (C), employers who attempt to comply in good faith are protected from civil and criminal penalties under federal law, § 1324a(b)(6)(A).
*752 The 1-9 system was the exclusive employment verification procedure under federal law until passage of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (“IIRIRA”). Chicanos Por La Causa, Inc. v. Napolitano, 558 F.3d 856, 861 (9th Cir.2009). In enacting IIRIRA, Congress “directed the Attorney General to establish three pilot programs to ensure efficient and accurate verification of any new employee’s eligibility for employment.” Id.; see IIRIRA, Pub.L. No. 104-208, div. C, § 401(a), 110 Stat. 3009-546, 3009-655 (1996).[2] Of those three, only the Basic Pilot Program remains.[3]
Unlike the 1-9 paper verification process, Basic Pilot is an internet-based system of employment authorization verification. Chicanos Por La Causa, 558 F.3d at 862. An employer seeking to participate in Basic Pilot must enter a Memorandum of Understanding with the federal government. E-Verify Memorandum of Understanding, available at http://www.usds. gov/files/nativedocuments/MOU.pdf. Under the program, an employer submits employee information electronically to the federal government, which then checks the information against a database containing citizenship and work authorization information. If the information submitted by the employer matches the Social Security database and the employee is a U.S. citizen, the employer is immediately notified that the employee is eligible to work in the United States. For noncitizens, the submitted information is checked against U.S. Citizenship and Immigration Services (“USCIS”) records.
By contrast, when employee information is inconsistent with either the Social Security or USCIS databases, the employer receives a tentative nonconfirmation. “A tentative nonconfirmation ... does not mean that the employee is not authorized to work, and employers may not interpret it as such.” Pilot Programs for Employment Eligibility Confirmation, 62 Fed.Reg. 48,309, 48,312 (Sep. 15, 1997) [hereinafter Pilot Programs]. Rather, because federal records may be inaccurate, the employee is notified of the tentative nonconfirmation and has eight federal workdays to contest the result.[4] Id. While the challenge is being resolved, the employer may not take adverse action against the employee. Id. at 48,310. An employee who does not contest the tentative nonconfirmation or is otherwise found ineligible to work must be terminated from employment lest the employer be presumed to have employed an unauthorized alien. Id. at 48,313.
Basic Pilot is a voluntary alternative to the 1-9 system for most employers. Expansion of the Basic Pilot Program to All 50 States and the District of Columbia; Providing Web-Based Access, 69 Fed.Reg. 75,997, 75,998 (Dec. 20, 2004). IIRIRA explains that “any person or other entity that conducts any hiring ... may elect to participate in that pilot program. Except as specifically provided in subsection (e), *753 the Attorney General may not require any person or other entity to participate in a pilot program.” IIRIRA § 402(a)[5]; see also § 402(d)(2) (“The Attorney General shall widely publicize the election process and pilot programs, including the voluntary nature of the pilot programs.... ”).
The record indicates that Basic Pilot is far from perfect. A 2007 report to the Department of Homeland Security (“DHS”) found that “the database used for verification is still not sufficiently up to date to meet the IIRIRA requirement for accurate verification.” Westat, Findings of the Web Basic Pilot Evaluation xxi (2007). That report documented an error rate of approximately 10% for naturalized citizens, and calculated that foreign-born individuals who are eligible to work in the United States were 30 times as likely to receive an erroneous tentative nonconfirmation as U.S.-born employees. Id. at xxv. It concluded further that “improvements are needed, especially if the Web Basic Pilot becomes a mandated national program,” id. at xxi, but that correcting the problems “will take considerable time and will require better data collection and data sharing between [Social Security], USCIS, and the U.S. Department of State than is currently the case,” id. at xxvi.
Through several extensions of Basic Pilot, Congress has opted to retain the program’s voluntary character. E.g., Omnibus Appropriations Act of 2009, div. J, § 101; Consolidated Security, Disaster Assistance, and Continuing Appropriations Act, 2009, Pub.L. No. 110-329, § 143, 122 Stat. 3574, 3580 (2008); Basic Pilot Extension Act of 2001, Pub.L. No. 107-128, § 2, 115 Stat. 2407, 2407 (2002).
B
With this federal law in mind, we turn to the Oklahoma Taxpayer and Citizen Protection Act of 2007. The Act reflects Oklahoma’s judgment that “illegal immigration is causing economic hardship and lawlessness in this state.” Oklahoma Taxpayer and Citizen Protection Act of 2007, 2007 Okla. Sess. Law. Serv., Ch. 112, § 2 (West). The Act states that unauthorized aliens have been “harbored and sheltered” in Oklahoma and issued “identification cards ... without verifying immigration status.” Id. These actions “impede and obstruct the enforcement of federal immigration law, undermine the security of our borders, and impermissibly restrict the privileges and immunities of the citizens of Oklahoma.” Id. “Discouraging] illegal immigration” and preventing employment of illegal aliens are avowed purposes of the three provisions at issue in this case. Id.
Section 7(B) of the Act, Okla. Stat. tit. 25, § 1313(B)(2), provides that no contractor or subcontractor may contract or subcontract with a public employer unless it utilizes the Status Verification System (“SVS”)[6] to verify work eligibility for all *754 new employees. Because it is undisputed that three of the four methods of participating in the SVS either do not exist, § 1312(l)(b), (c), or would require misuse of a federal program, § 1312(l)(d), the Act effectively mandates Basic Pilot, § 1312(l)(a). Thus, under Section 7(B), a contractor or subcontractor who verifies through the 1-9 system cannot obtain certain state contracts.[7]
Section 7(C) of the Act makes it a “discriminatory practice” for any employer to “discharge an employee working in Oklahoma who is a United States citizen or permanent resident alien while retaining an employee who the employing entity knows, or reasonably should have known, is an unauthorized alien.” § 1313(C)(1).[8] An employer who engages in such a discriminatory practice is subject to investigation by the Oklahoma Human Rights Commission (“HRC”), § 1502; temporary injunctive relief issued by an Oklahoma court at the request of the HRC, § 1502.1; cease-and-desist orders, § 1505(B); and affirmative relief, including reinstatement, back pay, costs and attorneys’ fees, § 1505(C). An employer that uses Basic Pilot, however, is “exempt from liability, investigation, or suit” under Section 7(C)’s safe harbor. § 1313(C)(2).
Section 9 of the Act, unlike federal verification law, requires all businesses to obtain “documentation to verify ... independent contractor^’] employment authorization.” Okla. Stat. tit. 68, § 2385.32.[9] If an independent contractor *755 does not provide proof that she is eligible to work, the contracting entity must withhold compensation in an amount equal to “the top marginal income tax rate” allowed under Oklahoma law. § 2385.32(A). This is an exception to the general rule in Oklahoma, under which contracting entities are not required to withhold taxes from independent contractors. § 1701.1(A), (C). Contracting entities that fail to comply with this withholding requirement are liable to the state for any withholding shortfall. § 2385.32(B).
C
Plaintiffs are various national, state, and local chambers of commerce and trade associations that represent businesses in Oklahoma. The Chambers filed a complaint in U.S. District Court for the Western District of Oklahoma alleging that Sections 7(B), 7(C), and 9 of the Oklahoma Act were expressly and impliedly preempted by federal law and thus unconstitutional under the Supremacy Clause. See U.S. Const, art. VI, cl. 2; 8 U.S.C. § 1324a(h)(2). They sought both declaratory and injunctive relief from defendants, Oklahoma Governor Brad Henry, Oklahoma Attorney General W.A. Drew Edmondson, the members of the Oklahoma HRC, and the members of the Oklahoma Tax Commission, all sued in their official capacities.[10]
The Chambers immediately moved for a preliminary injunction, and defendants moved to dismiss.[11] Denying all motions to dismiss, the district court issued a preliminary injunction prohibiting enforcement of the Act. It rejected defendants’ standing, sovereign immunity, and Tax Injunction Act arguments. With respect to the merits, the court concluded that the Chambers were substantially likely to succeed on their express preemption claim as to all three challenged sections of the Act because those sections imposed civil sanctions in contravention of 8 U.S.C. § 1324a(h)(2).[12] The court further determined that the remaining preliminary injunction factors were satisfied. All defen *756 dants, except Governor Henry, filed this timely interlocutory appeal.
II
We begin, as we must, by considering jurisdictional issues, turning first to the Chambers’ standing to challenge Sections 7(B), 7(C), and 9 of the Oklahoma Act.[13] Article III of the Constitution limits the jurisdiction of federal courts to actual cases or controversies. Summers v. Earth Island Inst., — U.S. -, 129 S.Ct. 1142, 1148, 173 L.Ed.2d 1 (2009); Dias v. City and County of Denver, 567 F.3d 1169, 1176 (10th Cir.2009). To establish standing, plaintiffs bear the burden of demonstrating that they have suffered an injury-in-fact which is concrete and particularized as well as actual or imminent; that the injury was caused by the challenged sections; and that the requested relief would likely redress their alleged injuries. Summers, 129 S.Ct. at 1149; Dias, 567 F.3d at 1176. Because the Chambers claim a future injury and seek relief in the form of a prospective injunction, they must show that the “threatened injury is real, immediate, and direct.” Davis v. FEC, — U.S. -, 128 S.Ct. 2759, 2769, 171 L.Ed.2d 737 (2008) (citation omitted); see also Dias, 567 F.3d at 1176-77. We review questions of standing de novo. Stewart v. Kempthorne, 554 F.3d 1245, 1254 (10th Cir.2009).
In the case at bar, plaintiffs allege associational standing to raise claims of their members. See Hunt v. Wash. State Apple Adver. Comm’n, 432 U.S. 333, 342, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). An association has such standing only if: “(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization’s purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.” Id. at 343, 97 S.Ct. 2434. Defendants challenge only the first prong of the Chambers’ associational standing, and the record reveals the latter two prongs have been met.
A
As to the Section 7(B) claim, Oklahoma contends that the Chambers’ members lack an injury-in-fact and that they have not demonstrated redressability. We disagree on both counts.
Both compliance and non-compliance with Section 7(B) injure the Chambers’ members. As noted above, Section 7(B) effectively forces employers to use Basic Pilot. See Part I.B., supra. Adopting Basic Pilot imposes significant economic injuries in the form of implementation and training expenses, which the Chambers allege may total well more than a thousand dollars per business per year. By the same token, the Chambers’ membership would also be harmed by noncompliance. Their membership includes companies that currently have contracts with public employers in Oklahoma and hope to enter into such contracts in the future but will be ineligible under the terms of Section 7(B) unless they adopt *757 Basic Pilot. Debarment from public contracts and the attendant economic losses are themselves harmful to the Chambers’ members.[14] These are “real, immediate, and direct” threats of injury. See Davis, 128 S.Ct. at 2769.
Redressability presents a more difficult question. Although plaintiffs seek an injunction against the Attorney General,[15] Oklahoma responds that the “Attorney General has no power to enforce Section 7(B).” (Attorney General’s Supp. Br. 2); see also Bronson v. Swensen, 500 F.3d 1099, 1111 (10th Cir.2007) (“The redressability prong is not met when a plaintiff seeks relief against a defendant with no power to enforce a challenged statute.”).
In deciding this issue, we are mindful that the Chambers need not show “that a favorable decision will relieve [their] every injury.” Larson v. Valente, 456 U.S. 228, 243 n. 15, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982). Rather, they need only show “an injury ... that is likely to be redressed by a favorable decision.” Id. (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 38, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)). In Larson, for example, the Court concluded that the plaintiff could challenge the constitutionality of a state statute applicable to religious organizations even though it was unclear whether the plaintiff qualified as a religious organization. Id. at 241-44, 102 S.Ct. 1673. Whether an injunction would benefit the plaintiff was unclear, yet the Court concluded that the plaintiffs injury was likely redressable. Id. at 242-43, 102 S.Ct. 1673. Similarly, in Massachusetts v. EPA, 549 U.S. 497, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007), the Court held that Massachusetts had standing to contest EPA’s refusal to regulate greenhouse gas emissions from new motor vehicles. Id. at 526, 127 S.Ct. 1438. Although a continued rise in sea levels on the shores of Massachusetts was contingent upon a number of variables beyond the control of EPA, the state’s injury was nonetheless deemed redressable because the risk of harm “would be reduced to some extent if petitioners received the relief they seek.” Id. at 526, 127 S.Ct. 1438 (emphasis added); see also id. at 525, 127 S.Ct. 1438 (“While it may be true that regulating motor-vehicle emissions will not by itself reverse global warming, it by no means follows that we lack jurisdiction to decide whether EPA has a duty to take steps to slow or reduce it.” (citing Larson, 456 U.S. at 244 n. 15, 102 S.Ct. 1673)).
We conclude that the harms alleged by the Chambers will likely be “reduced to some extent” by an injunction running against the Attorney General.[16] See id. at *758 526, 127 S.Ct. 1438; Larson, 456 U.S. at 244 n. 15, 102 S.Ct. 1673. As the Attorney General concedes, he drafts contracts for state officials upon request. See Okla. Stat. tit. 74, § 18b(A)(7). An injunction would prevent him from inserting into such contracts a provision requiring use of Basic Pilot, or from refusing to prepare a contract because it violates the terms of Section 7(B). Further, pursuant to his authority to “initiate or appear in any action in which the interests of the state or the people of the state are at issue,” § 18b(A)(3), the Attorney General brings civil actions against businesses that violate state law and defends state agencies sued by their contractors, see, e.g., Colclazier v. State ex rel. Okla. Indigent Defense Sys. Bd., 951 P.2d 622, 624 (Okla.1997) (Attorney General representing state agency in a suit seeking to compel agency to award a contract); State ex rel. Edmondson v. Cemetery Co., 122 P.3d 480, 481-82 (Okla.Civ.App.2005) (Attorney General seeking declaration that state statutes applied to particular company). An injunction would prevent him from filing lawsuits or defending against suits on the basis of Section 7(B). These statutory duties are more than sufficient to establish redressability at this stage of the case. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (explaining that the burden to demonstrate standing varies at different stages of litigation). “[A] favorable decision will relieve a discrete injury to” the Chambers. Larson, 456 U.S. at 243 n. 15, 102 S.Ct. 1673; see also Massachusetts, 549 U.S. at 526, 127 S.Ct. 1438. Accordingly, the Chambers have sufficiently demonstrated standing to seek a preliminary injunction as to Section 7(B).
B
We reach the same conclusion regarding the Chambers’ Section 7(C) claim. That section prohibits employers from firing an authorized worker while retaining an employee the employer knows or reasonably should know is unauthorized, Okla. Stat. tit. 25, § 1313(C)(1), but exempts employers from liability if they use Basic Pilot, § 1313(C)(2). Oklahoma argues that the Chambers lack standing to contest Section 7(C) because they have not sufficiently alleged injury-in-fact. Again, we do not agree.
To obtain the benefit of the Section 7(C) safe harbor, an employer must use Basic Pilot. As we explained, see Part II.A, supra, Basic Pilot imposes substantial costs that constitute injury-in-fact. Alternatively, an employer who opts not to take advantage of the state safe harbor and instead embraces the federal safe harbor for 1-9 users also suffers a cognizable injury. Such an employer is potentially exposed to Section 7(C) penalties including financial levies and injunctive action whenever it terminates an authorized employee. For instance, Section 7(C) exposure would be substantial for highway construction companies whose workforce fluctuates greatly throughout the year with every termination potentially leading to a lawsuit. (Webb Decl. 4, ¶ 18). It is hardly controversial that exposure to liability constitutes injury-in-fact. See MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 128-29, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007); Protocols, LLC v. Leavitt, 549 F.3d 1294, 1299-1301 (10th Cir.2008).
Oklahoma responds that in order to have standing to contest Section 7(C), an employer “would have to ‘knowingly’ hire illegal workers and then terminate the employment of a legal Oklahoma worker.”[17] *759 (Attorney General’s Br. 32). Both the Supreme Court and this court have steadfastly rejected such an onerous requirement. “[Wjhere threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat — for example, the constitutionality of a law threatened to be enforced.” Med-Immune, Inc., 549 U.S. at 128-29, 127 S.Ct. 764 (emphasis omitted). The Chambers’ complaint and declarations demonstrate injury-in-fact to their members, leading us to conclude they have standing to obtain a preliminary injunction as to Section 7(C).
C
Lastly, we dispose of Oklahoma’s argument that the Chambers lack standing to challenge Section 9 because they have failed to allege injury-in-fact. To comply with that section, a contracting entity must either verify the work eligibility of its individual independent contractors[18] or withhold from the independent contractors an amount equal to the top marginal income tax rate. Okla. Stat. tit. 68, § 2385.32(A). Because federal verification requirements are limited to employees (and do not extend to independent contractors), see 8 U.S.C. § 1324a(a)(l)(A); 8 C.F.R. § 274a.l(f), (g), businesses that opt for the verification approach are potentially exposed to liability under federal law for having engaged in “an unfair immigration-related employment practice,” see 8 U.S.C. § 1324b(a)(6), (b). To avoid that possibility, the Chambers have alleged that their members will either withhold money from individual independent contractors pursuant to Section 9(A) of the Oklahoma Act or incur penalties under Section 9(B). Okla. Stat. tit. 68, § 2385.32(A), (B). If a contracting entity chooses the former course, it must offset the withholding requirement by paying more money to its independent contractors. If it chooses the latter, it must pay a substantial fine. Either alternative results in an economic injury-in-fact.[19]
Ill
Having concluded that the Chambers possess standing to mount their challenge, we turn to the second alleged jurisdictional defect. According to the defendants, the Attorney General is immune from suit under the Eleventh Amendment as to all three challenged sections of the Oklahoma Act.[20] The Chambers advance counter-arguments to the Attorney General’s claim of immunity only as to Sections 7(B) and 7(C), but not as to Section 9. Plaintiffs have therefore waived any response to the contention that the Attorney General is immune from suit with respect to Section 9.
*760 We review de novo the denial of a motion to dismiss based on Eleventh Amendment immunity. Chaffin v. Kansas State Fair Bd., 348 F.3d 850, 865 (10th Cir.2003). Under the Eleventh Amendment, states are generally immune from suits brought in federal court by their own citizens, by citizens of other states, by foreign sovereigns, and by Indian tribes. See U.S. Const, amend. XI; Prairie Band Potawatomi Nation v. Wagnon, 476 F.3d 818, 827 (10th Cir.2007). However, the Eleventh Amendment does not apply to suits against a state officer in his official capacity seeking only prospective relief. Edelman v. Jordan, 415 U.S. 651, 667-68, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); Ex parte Young, 209 U.S. 123, 159-60, 28 S.Ct. 441, 52 L.Ed. 714 (1908). This exception applies so long as the defendant officer has “some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party.” Ex parte Young, 209 U.S. at 157, 28 S.Ct. 441. An officer need not have a “special connection” to the allegedly unconstitutional statute; rather, he need only “have a particular duty to ‘enforce’ the statute in question and a demonstrated willingness to exercise that duty.” Wagnon, 476 F.3d at 828 (citing Ex parte Young, 209 U.S. at 157, 28 S.Ct. 441); see also Finstuen v. Crutcher, 496 F.3d 1139, 1151 (10th Cir.2007) (“So long as there is [some] connection [with enforcement of the act], it is not necessary that the officer’s enforcement duties be noted in the act.” (quotation omitted)). Because the defendants are sued in their official capacities and the Chambers seek only prospective relief, Oklahoma disputes solely the connection between the Attorney General and enforcement of the challenged sections.
For the same reasons we concluded that the claimed Section 7(B) injury is redressable, Part II.A, supra, we conclude that the Attorney General has a particular duty to enforce that section, see Okla. Stat. tit. 74, § 18b(A)(3), (7), and a demonstrated willingness to exercise that duty, see, e.g., Colclazier, 951 P.2d at 624; Cemetery Co., 122 P.3d at 481-82. He is therefore a proper defendant for the Chambers’ Section 7(B) claim. See Wagnon, 476 F.3d at 828.
We reach the opposite conclusion with regard to Section 7(C) because the Chambers do not cite to any Oklahoma law authorizing the Attorney General to enforce that provision. A violation of Section 7(C) constitutes a “discriminatory practice” under Oklahoma’s Anti-Discrimination Act. Okla. Stat. tit. 25, § 1313(C)(1). But the sole provision of the Oklahoma Anti-Discrimination Act the Chambers cite requires only that the attorney general sue on behalf of a victim of discrimination in a housing context. § 1502.15(A); see also Collier v. Insignia Fin. Group, 981 P.2d 321, 325 (Okla.1999). Because the Chambers have not shown us that the Attorney General has a particular duty to enforce Section 7(C), see Wagnon, 476 F.3d at 828, the Chambers’ claim under that provision falls outside the scope of the Ex parte Young exception. The Attorney General is thus entitled to immunity as to that challenge. See Shell Oil Co. v. Noel, 608 F.2d 208, 211 (1st Cir.1979) (merely because “an attorney general has a duty to prosecute all actions in which the state is interested [is not] enough to make him a proper defendant in every such action” (citation omitted)).
IV
Oklahoma raises yet another jurisdictional challenge: It claims that the Tax Injunction Act (the “TIA”), 28 U.S.C. § 1341, deprived the district court of jurisdiction to enjoin Section 9. Because the *761 TIA implicates the subject matter jurisdiction of federal courts, we consider its applicability de novo. See Marcus v. Kan. Dept. of Revenue, 170 F.3d 1305, 1308-09 (10th Cir.1999). Oklahoma argues that Section 9 imposes a revenue-producing tax, which federal courts are without jurisdiction to enjoin. We conclude that Section 9 imposes a penalty, not a tax, because its purpose is to regulate conduct rather than to raise revenue. Accordingly, we reject Oklahoma’s TIA contention,
A
In its entirety, the TIA provides: “The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.” § 1341. There is no dispute that a sufficient remedy exists in Oklahoma state court. Accordingly, we need only decide if the assessment imposed by Section 9 is a tax within the meaning of § 1341. Marcus, 170 F.3d at 1312 n. 4. The answer to that question is a matter of federal law; whether the state labels the assessment a tax is not dispositive. Id. at 1311.
The purpose of the TIA is straightforward: It serves to protect the “federal balance” by permitting states to “define and elaborate their own laws through their own courts and administrative processes ... without undue interference from the Federal Judiciary.” Arkansas v. Farm Credit Servs. Of Cent. Ark., 520 U.S. 821, 826, 117 S.Ct. 1776, 138 L.Ed.2d 34 (1997). To that end, the TIA erects a broad barrier to the jurisdiction of federal courts. Id. at 825, 117 S.Ct. 1776. “[C]ourts must guard against interpretations of the Tax Injunction Act which might defeat its purpose and text.” Id. at 827, 117 S.Ct. 1776. Nevertheless, the Supreme Court has recently cautioned that the TIA is not a “sweeping congressional direction to prevent federal-court interference with all aspects of state tax administration.” Hibbs v. Winn, 542 U.S. 88, 105, 124 S.Ct. 2276, 159 L.Ed.2d 172 (2004) (quotation omitted).
It can generally be said that an assessment is a tax when its purpose is to raise revenue, “while levies assessed for regulatory or punitive purposes, even though they may also raise revenues, are generally not ‘taxes.’ ” Travelers Ins. Co. v. Cuomo, 14 F.3d 708, 713 (2d Cir.1994) (quotation omitted), rerid on other grounds, N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). In deciding whether Section 9 imposes a tax, the touchstone of our inquiry is the purpose of the assessment. See Hill v. Kemp, 478 F.3d 1236, 1244-45 (10th Cir.2007). In judging purpose, we consider, among other things, the ultimate use of the funds. Id. at 1245; Marcus, 170 F.3d at 1311 (citing Collins Holding Corp. v. Jasper County, 123 F.3d 797, 800 (4th Cir.1997); Hager v. City of W. Peoria, 84 F.3d 865, 870-71 (7th Cir.1996); San Juan Cellular Tel. Co. v. Pub. Serv. Comm’n of P.R., 967 F.2d 683, 685 (1st Cir.1992)). Yet, other evidence of purpose, such as the statute’s avowed purpose as stated in its text as well as the incentive structure created by a levy, are also relevant. RTC Commercial Assets Trust 1995-NP3-1 v. Phoenix Bond & Indem. Co., 169 F.3d 448, 457 (7th Cir.1999); Hager, 84 F.3d at 870-71.
Two of our principal cases in this area have looked to the ultimate use of funds generated by a levy as evidence of its purpose. Hill, 478 F.3d at 1244-46; Marcus, 170 F.3d at 1311-12. In Marcus, Kansas charged drivers $5.25 to obtain a disabled parking placard. Id. at 1307. A portion of that fee was deposited in a *762 dedicated fund to be used for the administration of the program at issue. Id. If that fund contained a positive balance at the end of the year, the balance would be transferred to the general fund. Id. Although it was unclear exactly how the other portion of the assessment was used, the statute mandated that the charge imposed for parking placards “shall not exceed the actual cost of issuance.” Kan. Stat. Ann. § 8-1,125(c). Thus, the entire charge was “expressly linked to defraying administrative costs.” Marcus, 170 F.3d at 1312. Because it was expressly tied to the administrative costs of a specific regulatory scheme, we determined that “the dominant purpose of these funds [was not] revenue raising.” Id. Rather, the assessment’s purpose was regulatory. Id. It therefore constituted a regulatory fee rather than a tax and fell outside the scope of the TIA. Id.
In Hill, we employed a similar analysis in reaching the opposite conclusion. 478 F.3d at 1244-46. At issue in that case were charges imposed by Oklahoma for specialty license plates bearing messages such as “Adoption Creates Families” and “Choose Life.” Id. at 1239. We emphasized the ultimate use of the funds in determining that the “primary purpose of the special license plate scheme is revenue[-raising] rather than regulation and thus ... it qualifies as a tax.” Id. at 1244-45. In particular, only $8.00 of a $35.00 charge was earmarked for administrative costs while the balance of the revenue was spread among a variety of programs, including those supporting the causes espoused by the license plates. Id. at 1245. Because the entire public benefited from the variety of state initiatives funded by the license plate scheme, we held that the assessments were taxes under the TIA. Id.
But use is not always conclusive evidence of purpose. Just as “[t]he label given by a state for. an assessment or charge is not dispositive” of its character, Marcus, 170 F.3d at 1311, neither is the ultimate use of funds dispositive of an assessment’s purpose, Hager, 84 F.3d at 870-71. As our sibling circuit has explained, regardless of the ultimate use of funds, a non-tax assessment “may [also] serve regulatory purposes directly by ... deliberately discouraging particular conduct by making it more expensive.” San Juan, 967 F.2d at 685 (citing South Carolina ex rel. Tindal v. Block, 717 F.2d 874, 887 (4th Cir.1983)). Our decisions recognize as much. The license plate charges at issue in Hill, for example, did not “purport to ‘regulate’ anyone by incentivizing or disincentivizing certain forms of conduct.” 478 F.3d at 1246; see also Marcus, 170 F.3d at 1311 (citing Hager, 84 F.3d at 870-71). Thus, “[r]ather than a question solely of where the money goes, the issue is why the money is taken.” Hager, 84 F.3d at 870-71. In Marcus and Hill, where the money went was strong evidence of why the money was taken. Hill, 478 F.3d at 1244-46; Marcus, 170 F.3d at 1311-12. In other cases, however, a statute’s incentive structure and avowed purpose more clearly elucidate its goal.
In RTC Commercial, for example, the court examined whether interest and penalties associated with nonpayment of taxes constituted taxes for purposes of the TIA. 169 F.3d at 457. Our sibling circuit concluded that the penalties were not taxes because they were assessed “so that delinquent tax debtors will be deterred the next time around from ignoring their legal obligations.” Id. The incentive structure created by the penalties revealed their regulatory character: Penalties are designed to incentivize compliance with law, not to raise revenue. Id. Conversely, interest was logically a part of the tax itself because it was meant solely to account for *763 the government’s opportunity cost resulting from the delay in receiving the funds. Id.
Similarly, in Hager, the Seventh Circuit addressed an assessment that was earmarked for a general city fund, a fact superficially suggesting that the levy’s ultimate purpose was to raise revenue. 84 F.3d at 870. But the court looked beyond the use of the funds, concluding instead that the fee was, as the ordinances at issue avowedly proclaimed, designed to regulate the weight of trucks using city streets. Id. at 871. The court’s analysis turned on the stated purpose of the assessment as articulated in the text of the ordinance, admissions by the city’s mayor about implementation, and the operation of the levy in the context of the state’s motor vehicle laws. Id. Although the revenue raised ended up in a general fund, the Seventh Circuit concluded that the assessment was a fee rather than a tax. Id. at 870-72. “That the ordinances generate a permit fee which goes to the general city fund is only incidental to its regulatory nature.” Id. at 871.
B
Applying these principles, we conclude that Section 9 of the Oklahoma Act constitutes a regulatory penalty, not a tax, because its purpose is to regulate behavior rather than to raise revenue. See Hill, 478 F.3d at 1244-46; Marcus, 170 F.3d at 1311-12; RTC Commercial, 169 F.3d at 457-58; Hager, 84 F.3d at 870-72; San Juan, 967 F.2d at 685-86. By its plain terms, Section 9 was enacted “pursuant to the prohibition against the use of unauthorized alien labor.” Okla. Stat. tit. 68, § 2385.32(A). Section 9 creates an incentive structure that, on pain of financial assessment, encourages employers to verify the employment authorization of their independent contractors. It imposes a penalty on contracting entities that do not verify eligibility or withhold taxes from their independent contractors, § 2385.32(B), thereby “deliberately discouraging particular conduct by making it more expensive,” San Juan, 967 F.2d at 685; see RTC Commercial, 169 F.3d at 457 (“States do not assess penalties for the purpose of raising revenue.... ”). As in RTC Commercial, Oklahoma imposes a penalty “so that delinquent [contracting entities] will be deterred the next time around from ignoring their legal obligations.” 169 F.3d at 457.
Moreover, the expressed primary goal of the Oklahoma Act is to regulate behavior.[21] Oklahoma means to “discourage illegal immigration” through verification of work eligibility. Oklahoma Taxpayer and Citizen Protection Act of 2002 § 2. As the Oklahoma Attorney General acknowledged in its motion to dismiss below, the Act aims to “discourag[e] illegal aliens from seeking refuge in this state ... [by] discouraging employers from hiring illegal aliens.” (Attorney General’s Mot. to Dismiss 24). As with the ordinances at issue in Hager, 84 F.3d at 871, the stated purpose of Section 9 is regulation, not revenue generation. The mere fact that revenue received from a violation of Section 9 ends up in Oklahoma’s general fund is of little significance when measured against the incentive structure created and the avowed statutory purpose. See id. (“That the ordinances generate a permit fee which goes to *764 the general city fund is only incidental to its regulatory nature.”).
In response, the Attorney General retreats to the generalized assertion that “the statute’s ultimate goal is to ensure that taxes are collected, not to regulate the employment of illegal aliens.” (Attorney General’s Br. 23). Notwithstanding that the Attorney General was of a different mind in the court below, (Attorney General’s Mot. to Dismiss 24), the primary purpose of Section 9 is not to ensure that taxes are collected. To the contrary, if a contracting entity complies with Section 9 by verifying the employment authorization of its independent contractors, Oklahoma does not receive any revenue. Okla. Stat. tit. 68, § 2385.32(A).[22] Only if a contracting entity violates Section 9 does the state receive revenue. It strains credulity to argue that the primary purpose of a law is to raise revenue when compliance with the law produces no revenue at all. See RTC Commercial, 169 F.3d at 457 (“In a Utopian world where all citizens complied fully with their obligations, no penalties at all would be collected.”).[23] Accordingly, the TIA does not strip the district court of jurisdiction over the Section 9 challenge.[24]
V
Satisfied of our jurisdiction, we turn at last to the main course. In order to obtain a preliminary injunction, the Chambers must show “(1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant’s favor; and (4) that the injunction is in the public interest.” Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 776 (10th Cir.2009) (quotation omitted). We review the district court’s grant of a preliminary injunction for abuse of discretion. Pac. Frontier v. Pleasant Grove City, 414 F.3d 1221, 1230-31 (10th Cir.2005). “A district court abuses its discretion when it commits an error of law or makes clearly erroneous factual findings.” Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC, 562 F.3d 1067, 1070 (10th Cir.2009).
*765 A
The Supremacy Clause provides that the laws of the United States “shall be the supreme Law of the Land[,] ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.” U.S. Const, art. VI, cl. 2. Pursuant to this provision, it has long been recognized that federal law preempts contrary state enactments. See M’Culloch v. Maryland, 17 U.S. (4 Wheat.) 316, 405-06, 4 L.Ed. 579 (1819). Preemption can be either express or implied. Hillsborough County v. Automated Med. Labs., Inc., 471 U.S. 707, 713, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985). State laws are expressly preempted when they fall within the scope of a federal provision explicitly precluding state action. See id. Alternatively, state laws may be impliedly preempted either as a result of conflict or field preemption. See id. We conclude that plaintiffs have demonstrated a strong likelihood that Section 7(C) is expressly preempted and that Section 9 is conflict preempted. Although my colleagues disagree, I would also hold that Section 7(B) is conflict preempted.
1
In considering express preemption, our inquiry is whether the state law at issue falls within the scope of a federal preemption provision. See Emerson v. Kan. City S. Ry. Co., 503 F.3d 1126, 1129 (10th Cir.2007). We apply ordinary principles of statutory interpretation, looking initially to the plain language of the federal statute. Sprietsma v. Mercury Marine, 537 U.S. 51, 62-63, 123 S.Ct. 518, 154 L.Ed.2d 466 (2002).
IRCA preempts “any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens.” [25] 8 U.S.C. § 1324a(h)(2) (emphasis added). Oklahoma contends that Section 7(C) does not impose “sanctions” because it provides compensatory rather than solely punitive relief. We disagree.
IRCA does not define “sanction,” but by its ordinary meaning, a sanction is “a restrictive measure used to punish a specific action or to prevent some future activity.” Webster’s Third New Int’l Dictionary 2009 (1993). Moreover, the statutory context does not evince an intent to narrowly define “sanction” as requiring a punitive component. Title 8, Section 1324a(e)(4)(A) outlines a series of “penalties” for employers hiring unauthorized aliens, ranging from $250 to $10,000. Penalties are ordinarily understood as serving punitive purposes. Yet, in § 1324a(h)(2) Congress used the term “sanctions” rather than “penalty” as it did in § 1324a(e)(4)(A). Had Congress intended to preempt only those state laws that are punitive, we would have expected it to use “penalties” in § 1324a(h)(2). Had it used “sanctions” in § 1324a(e)(4), we might reach a similar conclusion. It did neither.
Section 7(C) subjects employers to cease and desist orders, reinstatement, back pay, costs, and attorneys’ fees. Okla. Stat. tit. 25, § 1505(B), (C). Such impositions are “restrictive measures” that fall within the meaning of “sanctions” as used in § 1324a(h)(2). This conclusion is consistent with use of the term “sanction” in other provisions of federal law. An attor *766 ney, law firm, or party that violates Federal Rule of Civil Procedure 11(b), for example, is subject to “sanctions” including reasonable attorneys’ fees and other expenses, Fed.R.Civ.P. 11(c)(4) — the very type of sanctions imposed by Section 7(C). Similarly, costs and attorneys’ fees are mandatory sanctions for violations of Federal Rule of Civil Procedure 37(d). Fed. R.Civ.P. 37(d)(3).
Additionally, we conclude that Section 7(C) sanctions are imposed “upon those who employ ... unauthorized aliens,” 8 U.S.C. § 1324a(h)(2). An employer is subject to sanction under Section 7(C) if it terminates a legal worker while retaining a worker the employer knows, or should reasonably know, is an unauthorized alien. Okla. Stat. tit. 25, § 1313(C)(1). Sanctions are therefore contingent on the employment of an unauthorized alien. See id. We are not persuaded by Oklahoma’s contention that Section 7(C) merely creates a cause of action for the termination of legal residents. While that is a necessary prerequisite, an employer is subject to sanction only if the employer retains an unauthorized alien. Id. The Chambers are thus likely to succeed on the merits of this portion of their express preemption claim.
2
In contrast, neither Section 7(B) nor Section 9 “impos[e] civil or criminal sanctions ... upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens.” Id. (emphasis added). Even assuming that Sections 7(B) and 9 impose “sanctions” as that term is used in § 1324a(h)(2), imposition of such sanctions is divorced from the employment of unauthorized aliens. Section 7(B) forces contractors to use Basic Pilot if they seek to contract with public employers. Okla. Stat. tit. 25, § 1313(B)(2). Thus Section 7(B) is violated not when an unauthorized alien is employed, but when an employer fails to utilize the Basic Pilot Program. Id.; § 1312(l)(a). The actual employment of an unauthorized alien is irrelevant in determining whether an employer has violated Section 7(B). § 1313(B)(2).
Similarly, Section 9 applies to contracting entities that do not verify the work authorization status of their individual independent contractors and that fail to withhold from the independent contractor an amount equal to “the top marginal income tax rate” allowed under Oklahoma law. Okla. Stat. tit. 68, § 2385.32(A). Whether an independent contractor is an unauthorized alien is of no significance under this regime. As with Section 7(B), a contracting entity can violate Section 9 even if its independent contractors are fully authorized to work in the United States. Accordingly, neither Section 7(B) nor Section 9 “impos[es] civil or criminal sanctions ... upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens.” 8 U.S.C. § 1324a(h)(2). The Chambers, therefore, are unlikely to succeed on the merits of their claims that Sections 7(B) and 9 are expressly preempted by IRCA.
B
In addition to express preemption, the Supremacy Clause prohibits states from enacting laws that make compliance with both federal and state law a physical impossibility or that “stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.”[26] Fid. Fed. Sav. & Loan *767 Ass’n v. de la Cuesta, 458 U.S. 141, 152-53, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982) (quotation omitted). Even when federal and state statutes serve the same ultimate goal, “[t]he fact of a common end hardly neutralizes conflicting means.” Crosby v. Nat’l Foreign Trade Council, 530 U.S. 363, 379, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000); accord Int’l Paper Co. v. Ouellette, 479 U.S. 481, 494, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987). Although Section 9 does not render compliance with state and federal law a physical impossibility,[27] plaintiffs will likely succeed in their argument that the provision interferes with Congress’ chosen methods and is thus conflict preempted[28] Although my colleagues disagree, I would hold that the plaintiffs have made a similar showing regarding Section 7(B).
1
Congress sought to balance a number of competing goals when it enacted IRCA — a balance it determined was best served by requiring employers to verify the work authorization status of their employees by using the 1-9 system. “IRCA is a carefully crafted political compromise which at every level balances specifically chosen measures discouraging illegal employment with measures to protect those who might be adversely affected.” Nat’l Ctr. For Immigrants’ Rights, Inc. v. INS, 913 F.2d 1350, 1366 (9th Cir.1990), rev’d on other grounds, 502 U.S. 183, 112 S.Ct. 551, 116 L.Ed.2d 546 (1991).
Among these goals were preventing the hiring of unauthorized aliens, lessening the disruption of American business, and minimizing the possibility of employment discrimination. H.R.Rep. No. 99-682(1), at 56 (1986), as reprinted in 1986 U.S.C.C.A.N. 5649, 5660. IRCA forbids the hiring of unauthorized aliens, but to lessen the burden on employers, it limits penalties to those who “knowingly” violate the prohibition. 8 U.S.C. § 1324a(a)(l)(A). The federal statute provides a defense to employers who comply with the 1-9 requirements in good faith. § 1324a(a)(3). Employers are not required to verify the work eligibility of independent contractors, which would increase the burdens on business and could lead to increased employment discrimination. 8 C.F.R. § 274a.l(f), (g); see also H.R.Rep. No. 99-682(1), at 57, 68. By making the 1-9 system a uniform national requirement, Congress limited the compliance burden on interstate corporations while facilitating uniform enforcement. Finally, by forbidding employers from requesting “more or different documents” than § 1324a requires or “refusing to honor documents tendered that on their face reasonably appear to be genuine,” § 1324b(a)(6), Congress sought to limit employment discrimination, a goal which is also served by a uniform system of employment authorization verification, H.R.Rep. No. 99-682(1), at 68. IRCA thus *768 embodies a carefully considered balance of various competing objectives.
Against this backdrop, Congress enacted IIRIRA, directing the Attorney General (later the Secretary of Homeland Security) to establish the Basic Pilot Program as a voluntary supplement to, not a replacement for, the 1-9 system. Basic Pilot Program Extension and Expansion Act of 2003 §§ 3-4; IIRIRA § 401(a). Section 402 of IIRIRA stresses the voluntary nature of the program. See IIRIRA § 402(a) (“Voluntary Election.”); id. (“[A]ny person ... that conducts any hiring ... in a State in which a pilot program is operating may elect to participate .... ” (emphasis added)); § 402(d)(2) (“The [Secretary of Homeland Security] shall widely publicize the election process and pilot programs, including the voluntary nature of pilot programs .... ” (emphasis added)); § 402(d)(3), (3)(A) (“The [Secretary of Homeland Security] shall designate one or more individuals ... to inform persons and other entities that seek information about pilot programs of the voluntary nature of such programs .... ” (emphasis added)). Further, Congress withheld from the Secretary of Homeland Security authority to require private employers to utilize Basic Pilot. § 402(a) (“Except as specifically provided in subsection (e), the [Secretary of Homeland Security] may not require any person or other entity to participate in a pilot program.”); § 402(e) (listing particular federal government entities required to utilize Basic Pilot and authorizing the Secretary of Homeland Security to order certain violators of the Immigration and Nationality Act to use the program). Although Basic Pilot is now available in all fifty states, Congress continues to decline to make it mandatory. E.g., Omnibus Appropriations Act of 2009 div. J, § 101; Consolidated Security, Disaster Assistance, and Continuing Appropriations Act, 2009 § 143; Basic Pilot Extension Act of 2001 § 2.
2
I would hold that Section 7(B) disturbs the balance between these conflicting goals deliberately crafted by Congress.[29] In enacting IRCA, IIRIRA, and other immigration reforms along the way, Congress has made calibrated judgments regarding several competing considerations. Congress has continually concluded that employment verification should be required, but that the 1-9 system strikes the best balance between preventing employment of unauthorized workers, easing burdens on employers, and preventing employment discrimination.
Yet, Section 7(B) would make Basic Pilot effectively mandatory for many employers, on pain of debarment from public contracts. Because Oklahoma has mandated Basic Pilot despite Congress’ determination that employer participation should be voluntary, the Chambers can likely succeed in showing that Oklahoma has undermined Congress’ judgment that voluntary participation best serves the relevant competing considerations.[30] Such interference *769 with Congress’ selected means would violate the Supremacy Clause. Crosby, 530 U.S. at 379, 120 S.Ct. 2288.
3
We conclude that Section 9 similarly upsets Congress’ carefully constructed balance by interfering with its chosen methods. That provision would require contracting entities, on pain of burdensome withholding requirements or penalties, to verify the work authorization status of independent contractors. Congress, by contrast, intentionally excluded independent contractors from verification obligations. See 8 U.S.C. § 1324a(a)(l)(A); 8 C.F.R. § 274a.l(f), (g); H.R.Rep. No. 99-682(1), at 57. By requiring verification of independent contractors, Oklahoma risks exposing contracting entities to liability under federal law. See 8 U.S.C. § 1324b(a)(6), (b). Although a business must act with the specific intent to discriminate to be liable under federal law, § 1324b(a)(6), it is likely that a contracting entity will face increased claims of unfair employment practices as a result of the enhanced obligations Section 9 would impose.
4
Oklahoma’s principal argument in opposition to our conflict preemption holding is its assertion that “Oklahoma’s goals in implementing these statutes are consistent with federal goals in reducing illegal immigration.” (Attorney General’s Br. 50). But “[i]n determining whether [state] law ‘stands as an obstacle’ to the full implementation of [federal law], it is not enough to say that the ultimate goal of both federal and state law is [the same].” Int’l Paper Co., 479 U.S. at 494, 107 S.Ct. 805. “A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach this goal.” Id.
The Supreme Court’s decision in Geier v. American Honda Motor Co., 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000), is particularly instructive. In that case, plaintiffs sued Honda after Alexis Geier was seriously injured in a car crash. Id. at 865, 120 S.Ct. 1913. They claimed that the car Alexis was driving was negligently and defectively designed because it lacked a driver’s side airbag. Id. At the time of the accident, federal safety standards provided car manufacturers with a range of options for passive restraint devices. Id. at 874-75, 120 S.Ct. 1913. Geier’s lawsuit, by contrast, would have required auto manufacturers to install an airbag. Id. at 881, 120 S.Ct. 1913. Because that outcome would undermine Congress’ decision to permit a variety of devices, the state tort suit was impliedly preempted; it “would have stood as an obstacle to the accomplishment and execution of the important means-related federal objectives.” Id. (quotation omitted); see also de la Cuesta, 458 U.S. at 156, 102 S.Ct. 3014 (state law that limited the availability of an option considered essential to a federal scheme was conflict preempted).
The situation in Geier strongly parallels the interaction between Section 7(B) and IRCA. Federal law provides employers *770 with a carefully calibrated set of alternatives for verification of work authorization status. Whether to utilize the 1-9 system or the Basic Pilot Program is a choice that Congress has to date, in its considered judgment, given to employers. State tort law could not require automobile manufacturers to install particular safety precautions when Congress and the relevant federal agency expressly provided manufacturers with choices. Geier; 529 U.S. at 878, 881, 120 S.Ct. 1913. Similarly, state legislation may not mandate a particular verification method that Congress has expressly left voluntary. Section 7(B) effectively does just that, requiring employers to utilize Basic Pilot.
Geier’s reasoning implicates Section 9 as well. Whereas Section 7(B) would restrict the range of choices Congress offered employers, Section 9 would create obligations on contracting entities that Congress expressly chose not to impose. See 8 U.S.C. § 1324a(a)(l)(A); 8 C.F.R. § 274a.l(f), (g); H.R.Rep. No. 99-682(1), at 57; cf. Geier, 529 U.S. at 881, 120 S.Ct. 1913. Just as state tort law could not require airbag installation when the federal government had balanced competing interests and decided against such a requirement, Geier, 529 U.S. at 877-78, 120 S.Ct. 1913, neither can Oklahoma’s statutory law require verification of independent contractors when Congress plainly chose not to do so.
5
Finally, Oklahoma’s reliance on Chicanos Por La Causa is misplaced. In that case, the Ninth Circuit concluded that an Arizona law requiring employers to use Basic Pilot was not expressly preempted because it fell within 8 U.S.C. § 1324a(h)(2)’s savings clause, 558 F.3d at 866, and that the state law was not impliedly preempted, id. at 866-67. Its implied preemption holding was based in large part on the initial conclusion that the Arizona law fell within the savings clause. Id. at 867. The court stated:
Congress could have, but did not, expressly forbid state laws from requiring [Basic Pilot Program] participation. It certainly knew how to do so because, at the same time, it did expressly forbid any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens.
Id. (quotation omitted). This is problematic because it implies that the presence of an express preemption provision precludes the possibility of implied preemption. But that is emphatically not the case. Geier, 529 U.S. at 869, 120 S.Ct. 1913 (“We now conclude that the saving clause (like the express pre-emption provision) does not bar the ordinary working of conflict pre-emption principles.”). On the one hand, because Oklahoma has waived any argument that its Act is a licensing or other similar law, 8 U.S.C. § 1324a(h)(l); supra note 23, the Ninth Circuit’s opinion is distinguishable. On the other, we are unpersuaded by its reasoning.
C
Having concluded that the Chambers have shown a strong likelihood of succeeding on the merits of their preemption challenges to Sections 7(C) and 9, we turn to the remaining preliminary injunction factors. To obtain a preliminary injunction, the Chambers must also demonstrate a likelihood that they will suffer irreparable harm absent preliminary relief, that the balance of equities tips in their favor, and that the injunction is in the public interest. Tyson Foods, Inc., 565 F.3d at 776.
We conclude that the Chambers will likely suffer irreparable harm absent a preliminary injunction. Imposi *771 tion of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury. Kan. Health Care Ass’n, Inc. v. Kan. Dep’t of Social & Rehab. Servs., 31 F.3d 1536, 1543 (10th Cir.1994); see also Ohio Oil Co. v. Conway, 279 U.S. 813, 814, 49 S.Ct. 256, 73 L.Ed. 972 (1929) (holding that paying an allegedly unconstitutional tax when state law did not provide a remedy for its return constituted irreparable injury in the event that the statute were ultimately adjudged invalid); Greater Yellowstone Coal. v. Flowers, 321 F.3d 1250, 1258 (10th Cir.2003) (“An irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages.” (quotation and emphasis omitted)). If forced to comply with the Oklahoma Act, the Chambers’ members will face a significant risk of suffering financial harm as described in Part II. Yet, because Oklahoma and its officers are immune from suit for retrospective relief, Edelman, 415 U.S. at 667-68, 94 S.Ct. 1347, these financial injuries cannot be remedied. Should the Chambers’ members decline to comply with the Act, they face investigation and other consequences for having engaged in a discriminatory practice under Section 7(C) and liability under Section 9 for having failed to verify the work authorization of independent contractors. I would further note that they face debarment from public contracts under Section 7(B). These consequences, in and of themselves, demonstrate a likelihood of irreparable harm.
Moreover, the balance of equities tips in the Chambers’ favor, and the public interest is served by an injunction. Oklahoma does not have an interest in enforcing a law that is likely constitutionally infirm. Moreover, “the public interest will perforce be served by enjoining the enforcement of the invalid provisions of state law.” Bank One v. Guttau, 190 F.3d 844, 848 (8th Cir.1999); see also Utah Licensed Beverage Ass’n v. Leavitt, 256 F.3d 1061, 1076 (10th Cir.2001) (public interest favors preliminarily enjoining state statutes likely to be held unconstitutional). We are unpersuaded by the argument that the Oklahoma Act vindicates the public interest because it serves a purpose consistent with federal law: deterrence of illegal immigration and the hiring of unauthorized workers. Even assuming federal law singlemindedly pursues this goal, it does not follow that simply because the two serve the same goal, enforcing the state law is in the public interest. “The fact of a common end hardly neutralizes conflicting means.” Crosby, 530 U.S. at 379, 120 S.Ct. 2288. Ultimately, we conclude that the district court did not abuse its discretion in granting a preliminary injunction.
VI
For the reasons stated, we DISMISS the Attorney General from the case insofar as he is named as a defendant in the challenges to Sections 7(C) and 9. The district court’s grant of summary judgment against the enforcement of Section 7(B) is REVERSED. In all other respects, the judgment of the district court is AFFIRMED. Plaintiffs’ motion to strike is GRANTED.

. Although the parties use varying terminology, because both federal law and the Oklahoma Act use the term “unauthorized alien,” 8 U.S.C. § 1324a(a)(l); Okla. Stat. tit 25, § 1312(4), we employ that phrase.

. Sections 401 to 405 of IIRIRA, which govern the pilot programs, are not codified in the body of the U.S.Code but appear in a note appended to 8 U.S.C. § 1324a.

. Basic Pilot is also commonly referred to as E-Verify. Congress recently extended Basic Pilot through September 30, 2012. Department of Homeland Security Appropriations Act, 2010, Pub.L. No. 111-83, title v, § 547, 123 Stat. 2142, 2177. Although the statute initially gave the Attorney General responsibility for Basic Pilot, the Department of Homeland Security now administers it. See Basic Pilot Program Extension and Expansion Act of 2003, Pub.L. No. 108-156, §§ 3-4, 117 Stat. 1944, 1944-45.

. An executive branch report to Congress in the record indicates that employees have ten federal workdays to contest a tentative non-confirmation.

. Subsection 402(e) lists particular federal government entities required to utilize Basic Pilot, and authorizes the Secretary of Homeland Security to order certain violators of the Immigration and Nationality Act to use the program. § 402(e).

. Section 6 of the Act defines Status Verification System as:
a. the electronic verification of work authorization program of the Illegal Immigration Reform and Immigration Responsibility Act of 1996, P.L. 104-208, Division C, Section 403(a); 8 U.S.C., Section 1324a, and operated by the United States Department of Homeland Security, known as the Basic Pilot Program,
b. any equivalent federal program designated by the United States Department of Homeland Security or any other federal agency authorized to verify the work eligibility status of newly hired employees, pursuant to the Immigration Reform and Control Act of 1986 (IRCA), D.L. 99-603,
*754 c. any other independent, third-party system with an equal or higher degree of reliability as the programs, systems, or processes described in this paragraph, or
d. the Social Security Number Verification Service, or such similar online verification process implemented by the United States Social Security Administration[.]
§ 1312(l)(a)-(d).

. In full, Section 7(B) provides:
1. After July 1, 2008, no public employer shall enter into a contract for the physical performance of services within this state unless the contractor registers and participates in the Status Verification System to verify the work eligibility status of all new employees.
2. After July 1, 2008, no contractor or subcontractor who enters into a contract with a public employer shall enter into such a contract or subcontract in connection with the physical performance of services within this state unless the contractor or subcontractor registers and participates in the Status Verification System to verily information of all new employees.
3. The provisions of this subsection shall not apply to any contracts entered into prior to the effective date of this section even though such contracts may involve the physical performance of services within this state after July 1, 2008.
§ 1313(B) (footnote omitted).

. In full, Section 7(C) states:
1. It shall be a discriminatory practice for an employing entity to discharge an employee working in Oklahoma who is a United States citizen or permanent resident alien while retaining an employee who the employing entity knows, or reasonably should have known, is an unauthorized alien hired after July 1, 2008, and who is working in Oklahoma in a job category that requires equal skill, effort, and responsibility, and which is performed under similar working conditions, as defined by 29 U.S.C. § 206(d)(1), as the job category held by the discharged employee.
2. An employing entity which, on the date of the discharge in question, was currently enrolled in and used a Status Verification System to verify the employment eligibility of its employees in Oklahoma hired after July 1, 2008, shall be exempt from liability, investigation, or suit arising from any action under this section.
3. No cause of action for a violation of this subsection shall arise anywhere in Oklahoma law but from the provisions of this subsection.
§ 1313(C).

. In its entirely, Section 9 provides:
A. If an individual independent contractor, contracting for the physical performance of services in this state, fails to provide to the *755 contracting entity documentation to verify the independent contractor’s employment authorization, pursuant to the prohibition against the use of unauthorized alien labor through contract set forth in 8 U.S.C. § 1324a(a)(4), the contracting entity shall be required to withhold state income tax at the top marginal income tax rate as provided in Section 2355 of Title 68 of the Oklahoma Statutes as applied to compensation paid to such individual for the performance of such services within this state which exceeds the minimum amount of compensation the contracting entity is required to report as income on United States Internal Revenue Service Form 1099.
B. Any contracting entity who fails to comply with the withholding requirements of this subsection shall be liable for the taxes required to have been withheld unless such contracting entity is exempt from federal withholding with respect to such individual pursuant to a properly filed Internal Revenue Service Form 8233 or its equivalent. C. Nothing in this section is intended to create, or should be construed as creating, an employer-employee relationship between a contracting entity and an individual independent contractor. § 2385.32.

. We use "HRC” and "Tax Commission” as shorthand, recognizing that the lawsuit is against the members of those commissions in their official capacities.

. As outlined in the complaint, the Chambers requested that the Governor and Attorney General be enjoined from enforcing Sections 7(B), 7(C), and 9; that the HRC be enjoined from enforcing Section 7(C); and that the Tax Commission be enjoined from enforcing Section 9.

. Because it concluded that Sections 7(B), 7(C), and 9 were likely expressly preempted, the district court did not consider the Chambers' alternative arguments that these sections were either field or conflict preempted.

. In addition to questioning this court’s jurisdiction, the Tax Commission argues that the Chambers "bring their suit as a civil rights suit under 42 U.S.C. § 1983,” which we are told does not permit a preemption claim. Although the Chambers did invoke § 1983 in their complaint, they also expressly and repeatedly indicated that their claims arose under the Supremacy Clause. We have held that "[a] party may bring a claim under the Supremacy Clause that a local enactment is preempted even if the federal law at issue does not create a private right of action.” Qwest Corp. v. City of Santa Fe, 380 F.3d 1258, 1266 (10th Cir.2004). Because the Chambers have a valid right of action under the Supremacy Clause, we need not address the Tax Commission’s § 1983 argument.

. We find no merit to Oklahoma's argument that the Chambers lack standing because they are not required to do business with the State. Even if businesses are not required to contract with the State, Oklahoma may not impose unconstitutional limitations on businesses that choose to do so.

. Oklahoma's governor was also preliminarily enjoined from enforcing Section 7(B), but he has not appealed. Thus, we need not consider whether the injunction would redress the Chambers’ injury as to the Governor. No matter the result of this interlocutory appeal, the injunction will operate against the Governor pending further proceedings in the district court.

. That some public employers outside the scope of the injunction might refuse to enter into contracts with businesses employing only 1-9 verification does not divest plaintiffs of standing. An opposite holding would contravene Supreme Court precedent so as to require complete redressability. In any event, "we may assume it is substantially likely that [other] officials would abide by an authoritative interpretation of the ... provision ... even though they would not be directly bound by such a determination.” Utah v. Evans, 536 U.S. 452, 460, 122 S.Ct. 2191, 153 L.Ed.2d 453 (2002) (quotation omitted).

. Oklahoma misstates the scienter requirement of Section 7(C). Employers are liable if *759 they "know[], or reasonably should have known,” that they retained an unauthorized alien while terminating an authorized worker. Okla. Stat. tit. 25, § 1313(C)(1) (emphasis added).

. Specifically, the statutory language requires the employer to receive "documentation to verify the independent contractor’s employment authorization.” Okla. Stat. tit. 68, § 2385.32(A). For the sake of brevity, we refer to this obligation as verification.

. Oklahoma also asserts that the Chambers lack standing to challenge Section 9 as against either the Attorney General or the HRC, but we read the complaint as naming only the Governor and Tax Commission as defendants in the challenge to Section 9. See supra note 11.

. HRC has conceded that its members are not immune with respect to Section 7(C), (Attorney General’s Br. 14, 20), as has the Tax Commission with respect to Section 9, (Tax Commission’s Br. 4). See supra note 11.

. The partial dissent asserts that we "improperly focus[ ] on the motive for enactment of" Section 9 because "[t]he TIA is not concerned with why a state chooses to collect its taxes in a particular manner.” (Dissenting Op. 10.) As discussed supra, however, the purpose of an assessment is key to our determination of whether it is a tax or a penalty. See Hill, 478 F.3d at 1244-45.

. The partial dissent argues that Section 9 is "not some special assessment but income tax, pure and simple.” (Dissenting Op. 9-10.) However, the fact that the amount of the penalty is set at the maximum assessable level of income tax and that Oklahoma uses the tax system to collect the revenue does not transform this penalty into a tax. To decide that issue, we must inquire into the statute’s purpose; here, that purpose is to ensure that employers verify the employment authorization status of their employees.

. Admittedly, a contracting entity may also comply with Section 9 by withholding an amount equal to "the top marginal income tax rate” allowed under Oklahoma law. Oída. Stat. tit. 68, § 2385.32(A). But Section 9 and the Oklahoma Act as a whole incentivize employment authorization verification above all else. See, e.g., Okla. Stat. tit. 25, § 1312(l)(a)-(d) (defining Status Verification System); § 1313(B)(2) (prohibiting businesses from contracting with public employers unless the business utilizes SVS); § 1313(C)(2) (providing a safe harbor from discriminatory practice liability for employers who utilize Basic Pilot); Oklahoma Taxpayer and Citizen Protection Act of 2002 § 2 (stating that the purpose of the Act is to "discourage illegal immigration” through verification of immigration status). The primary purpose, therefore, is not to raise revenue because the preferred form of compliance does not generate revenue.

. The Tax Commission has a slightly different take than the Attorney General. The Commission contends that Section 9 creates a method of tax collection that may not be enjoined under the terms of the TIA. We need not address whether § 1341 deprives federal district courts of jurisdiction to enjoin the method a state chooses to collect a tax, however, because we disagree with the premise of the Commission's argument. Oklahoma is not collecting a "tax”; it is collecting a penalty designed to regulate conduct.

. Until its reply brief, Oklahoma did not argue that the parenthetical savings clause in § 1324a(h)(2) spared the Oklahoma Act from express preemption. Plaintiffs filed a motion to strike that portion of Oklahoma’s reply brief which, for the first time, argues that the portions of the Act were akin to licensing laws. Oklahoma has failed to preserve this argument, Bronson, 500 F.3d at 1104, and plaintiffs’ motion to strike is thus granted.

. Neither the presence of an express preemption provision nor the presence of a savings clause by itself alters the operation of traditional implied preemption principles. Geier v. Am. Honda Motor Co., 529 U.S. 861, 869, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000).

. Because federal law authorizes use of the Basic Pilot Program (albeit under certain constraints imposed by DHS), a business employing Basic Pilot under the terms of Section 7(B) would also be in compliance with federal law. Section 9 forces contracting entities to verify the work authorization of their independent contractors. This potentially exposes the business to liability for having engaged in an unfair immigration-related employment practice. See 8 U.S.C. § 1324b(a)(6). The federal prohibition, however, requires a specific intent to discriminate, id., which presumably would be lacking if the contracting entity verified with the sole purpose of complying with Section 9.

. Because we conclude that the Chambers are likely to succeed on the merits of their conflict preemption challenge to Section 9, we need not address whether Congress has occupied the field of work authorization verification.

. I reject Oklahoma's request that we apply a presumption against preemption. As the Supreme Court has made clear, "an assumption’ of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence." United States v. Locke, 529 U.S. 89, 108, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000) (citing Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). Federal regulation of immigration is longstanding, as is its regulation of work authorization verification.

. As of September 8, 2009, Executive Order 12,989 requires federal government contractors to use Basic Pilot to confirm the immigration status of all employees working directly on federal government contracts and all *769 employees hired during the contract terms regardless of whether or not they work on the contracts. The power of the President to mandate the use of Basic Pilot in the face of the congressional directive to the Attorney General preventing him from doing so is not at issue before us. Regardless, nothing in this executive action allows the judicial branch to ignore congressional language that indicates the program should not be mandatory. It is particularly inappropriate to give determinative weight to this executive action given the statistical disparities in tentative non-confirmation rates between work-eligible foreign-born employees and U.S.-born employees discussed supra.