FILED
United States Court of Appeals
Tenth Circuit

May 7, 2012

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CONSUMER DATA INDUSTRY
ASSOCIATION,

        Plaintiff-Appellant,

v.

GARY K. KING, in his official capacity as
Attorney General for the State of New
Mexico,

        Defendant-Appellee.

No. 11-2085

---

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 1:10-CV-00458-MCA-WDS)**

---

James Chareq of Hudson Cook LLP, Washington, DC (Charles J. Vigil of Rodey,
Dickason, Sloan, Akin & Robb, Albuquerque, New Mexico, with him on the brief) for
Plaintiff-Appellant.

Philomena Hausler (Luis E. Robles on the brief) of Robles, Rael & Anaya, P.C.,
Albuquerque, New Mexico, for Defendant-Appellee.

---

Before **KELLY**, **MURPHY**, and **O'BRIEN**, Circuit Judges.

---

**O'BRIEN**, Circuit Judge.

## I. INTRODUCTION

New Mexico enacted a law making it easier for victims of identity theft to

expunge negative information from their credit reports. Before the law took effect, the Consumer Data Industry Association ("CDIA"), a trade group comprised of hundreds of consumer-data companies, brought a pre-enforcement challenge contending the law is preempted by the federal Fair Credit Reporting Act ("FCRA"). The CDIA sought declaratory and injunctive relief against the New Mexico Attorney General, who, along with aggrieved consumers, has authority to enforce the law through civil suit. Concluding equitable relief against the Attorney General would not adequately redress CDIA's injuries, the district court dismissed the case as non-justiciable. We vacate the district court's judgment and remand for further proceedings.

## II. BACKGROUND

Congress enacted the FCRA in 1970 with the aim of protecting the banking system from inaccuracy and abuse in credit reporting. The FCRA creates a uniform set of rules governing the content of consumer reports and the responsibilities of those who maintain them. 15 U.S.C. § 1681 et seq. Together with the Fair Debt Collection Practices Act, the FCRA is the source of most consumer credit rights in the United States.

Congress amended the FCRA in 2003 to add safeguards for victims of identity theft. *See* Fair and Accurate Credit Transactions Act, Pub. L. No. 108-159, 117 Stat. 1952 (2003). Under the amendments, consumer reporting agencies ("CRAs") must, upon a good-faith request from a consumer, include a fraud alert in the consumer's file limiting the extent to which creditors can extend credit to an applicant using the consumer's name without first verifying the applicant's identity. 15 U.S.C. § 1681c-1(a) & (h). They must

also block the reporting of any information identified by the consumer as resulting from identify theft. *Id*. § 1681c-2. The block must generally take effect upon proof of the consumer's identity and receipt of an identity-theft report, but, as a concession to the consumer-data industry, Congress allowed CRAs to override the block if they reasonably determine it was requested in error or on the basis of a misrepresentation. *Id*. § 1681c-2(c).

The FCRA leaves no room for overlapping state regulations. Congress set out to create uniform, national standards in the area of credit reporting, and the FCRA expressly preempts any state requirement or prohibition relating to, among other things, matters regulated under § 1681i (concerning the time by which CRAs must take certain actions) and § 1681c (concerning the content of consumer reports and a CRA's duties in addressing reports of identity theft). Id. §§ 1681t(b)(1)(B)&(E), 1681t(b)(5)(C).

In 2010, the New Mexico legislature enacted its own identity-theft requirements for CRAs operating in state. *See* Fair Credit Reporting and Identity Security Act ("FCRISA"), N.M. STAT. ANN. § 56-3A-1. The law contains several apparent conflicts with the FCRA, but most notable for the purposes of this appeal are sections 56-3A-3.1(D) & (E), which govern CRAs' required response when presented with requests to remove information resulting from identity theft. Federal law permits a CRA to decline such a request if it reasonably determines the request to be fraudulent or erroneous, 15 U.S.C. § 1681c-2(c). New Mexico law, on the other hand, requires a CRA to oblige the request until a court or the affected consumer says otherwise. N.M. STAT. ANN. § 56-3A-

- 3 -

3.1(D) & (E). New Mexico's block-first-ask-later rule is therefore in tension with one of the key legislative compromises of the FCRA—the requirement that CRAs be given an opportunity to investigate suspicious block requests before acceding to them.

If a CRA violates the FCRISA, both the affected consumer and the Attorney General have the right to bring a civil action against the CRA. Id. § 56-3A-5. Relief can take the form of an injunction to prevent further violations, actual damages sustained by the consumer, and civil penalties. *Id*.

CDIA brought this suit in federal court for declaratory and injunctive relief. It contends certain provisions of the FCRISA are preempted by the FCRA and must give way to federal law under the Supremacy Clause. Asserting associational standing on behalf of some two-hundred-plus members, CDIA contends the preempted law places consumer data companies in an unenviable double-bind: submit to the preempted law and endure the costs of modifying otherwise uniform procedures, or violate the law and face the likelihood of lawsuits and penalties. CDIA obtained a temporary restraining order (TRO) enjoining New Mexico from enforcing sections 56-3A-3.1(D)&(E). The TRO had a nine-month shelf life during which CRAs had no obligation to comply with the challenged provisions or defend suits alleging violations.

Several months later, following briefing from both sides, the district court dissolved the TRO and dismissed the case, asserting the CDIA had failed to prove redressability, an element of constitutional standing. It reasoned that enjoining the Attorney General from enforcing the New Mexico law would redress only part of

CDIA's injury; CDIA members would still be exposed to consumer-driven suits, and therefore would still face the dilemma of either paying the costs of complying with the New Mexico law or exposing themselves to liability for violating it. Relying on our decision in *Nova Health Sys. v. Gandy*, 416 F.3d 1149 (10th Cir. 2005), the court concluded that neither an injunction nor a declaratory judgment against the Attorney General would "materially reduce the coercive effect of" the FCRISA, because in either case consumers could still bring private lawsuits in state court.

## III.  DISCUSSION

A.  Whether CDIA has standing to seek injunctive relief against the Attorney General

There are three components to Article III standing—injury, causality, and redressability—and each must be established before a federal court can review the merits of a case. *Summers v. Earth Island Inst.*, 555 U.S. 488, 492-93 (2009). Although CDIA had not yet been injured when it filed suit, the existence of a statute implies the threat of its enforcement, and the association was entitled to bring a pre-enforcement challenge based on the probability of future injury. *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983); *Abbott Labs. v. Gardner*, 387 U.S. 136, 153-54 (1967).

The primary issue on appeal is whether the injury identified in the complaint can be redressed by the relief sought against the Attorney General. It is CDIA's contention that it can, and that the district court's conclusion to the contrary was based on an unduly restrictive conception of redressability. In CDIA's view, if a court can provide the requested relief, thereby improving upon the status quo ante, the claim is justiciable, even

if it does not completely redress the claimed injury.

Like the other elements of standing, redressability is meant to foster the "concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Duke Power Co. v. Carolina Envtl. Study Group*, 438 U.S. 59, 72 (1978). "[T]he relevant inquiry is whether . . . the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976). The Supreme Court has rejected interpretations of the rule that demand complete redressability, stressing that a plaintiff need show only that a favorable decision would redress "*an* injury," not "*every* injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982). Hence *Massachusetts v. EPA*, 549 U.S. 497, 526 (2007), where the Supreme Court concluded that Massachusetts had standing to challenge the EPA's refusal to regulate greenhouse-gas emissions despite the attenuated causal chain linking agency non-action to potential environmental damage. Redressability was satisfied, the Court explained, because the risk of harm "would be reduced *to some extent* if petitioners received the relief they seek." *Id*. (emphasis added).

Echoing this principle, in *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 757 (10th Cir. 2010), we decided that a group of business federations could seek an injunction restraining the Oklahoma Attorney General from enforcing a law requiring public employers to condition eligibility for state contracts on the contractor's use of a specific system for verifying the immigration status of its workers. *Id*. at 750. Oklahoma

- 6 -

had argued that a favorable decision against the Attorney General would not materially redress the plaintiffs' primary injury—the choice between paying the costs of complying with the law or being deemed ineligible for state contracts. As the State saw it, that injury had nothing to do with the Attorney General and everything to do with public employers who refused to contract with non-complying businesses. *Id.*

Still, this Court was satisfied that an injunction against the Attorney General would alleviate the injury to some extent. *Id.* at 758. Since the Attorney General often prepared contracts at the request of public employers, an injunction would preclude him from adding clauses requiring the use of the designated verification system. *Id.* An injunction would also prevent the Attorney General from filing or defending lawsuits on the basis of the challenged provision. *Id.* These were discrete injuries redressable by the requested relief, and it mattered not that public employers could still refuse to enter into contracts with non-complying businesses. "An opposite holding," the court explained, "would contravene Supreme Court precedent so as to require complete redressability." *Id.* at n. 16.

Against this backdrop, it seems uncontroversial that restraining the Attorney General from enforcing the allegedly preempted provisions of the FCRISA would go a long way toward providing relief for CDIA's members. Indeed, even if CDIA's members would not be out of the woods, a favorable decision would relieve their problem "to some extent," which is all the law requires. *See Massachusetts v. EPA*, 549 U.S. at 526. The district court, however, read this court's decision in *Nova Health* as

compelling a different conclusion, and CDIA's appeal hinges on whether the district court's reading was proper.

The statute at issue in *Nova Health* made abortion providers liable for medical costs resulting from abortions performed on minor patients whose parents were not notified prior to surgery. 416 F.3d at 1152-53. Among those authorized to sue for costs were the minor patients and any medical facility incurring costs for treating them. *Id*. Nova Health Services, an abortion provider, sued the administrators of several public health institutions, asking the district court to declare the statute unconstitutional and to enjoin the defendants from filing suit. *Id*. Although the named defendants were public officials, none had sued or threatened to sue Nova, nor had any possessed enforcement authority beyond what the statute granted to any medical facility incurring costs for treating minors with abortion-related complications. *Id*. at 1153-54, 1157.

Not surprisingly, the primary question on appeal was whether Nova could fairly trace its injury to the conduct of the named defendants. *Id*. at 1156. In concluding that it could not, we explained that "[e]ven if these defendants were enjoined from seeking damages against Nova. . ., there would still be a multitude of other prospective litigants who could potentially sue Nova under that act." *Id*. at 1157. Although public officials by title, the defendants were in the same position as any private litigant who could bring a claim under the challenged provision. *Id*. The very power to litigate, we explained, was not sufficient to support standing: "Article III does not allow a plaintiff who wishes to challenge state legislation to do so simply by naming as a defendant anyone who, under

appropriate circumstances, might conceivably have an occasion to file a suit . . . under the relevant state law at some future date." *Id*. at 1157-58.

Here, in concluding CDIA lacked standing to sue, the district court thought CDIA's pre-enforcement challenge suffered from the same defect as the one in *Nova Health*:  it sought to restrain one party from enforcing the challenged statute where there was a multitude of litigants with identical enforcement power outside the scope of the injunction.  Even with the Attorney General out of the picture, the district court reasoned, aggrieved consumers would still have the right to sue, and CDIA's members would still be left to choose between litigation and the costs of compliance.  "An injunction that merely prohibits [the Attorney General] from enforcing the FCRISA, while leaving every affected consumer free to pursue a private lawsuit," the court stated, "appears unlikely to eliminate the dilemma faced by CDIA's members."  (D. Ct. Order at 6).

The district court stretched *Nova Health* beyond its elastic limits.  *Nova Health* is a fact-bound decision with little bearing on the merits of this case.  It sheds no light on the doctrine of redressability beyond its narrow holding—a party lacks standing to seek an injunction against a nominally public defendant who has not threatened suit and who cannot be distinguished from the countless private litigants with identical enforcement powers.  That holding does not apply here because the Attorney General *does* have special enforcement authority and *can* be distinguished from the garden-variety private

litigant.[1] The chief distinctions are obvious: The Attorney General is the state's most powerful litigant and, in this case, the only one authorized to sue on behalf of New Mexico. His office has the resources to outlast private consumers and the manpower to prosecute dozens of cases at a time. More importantly, his right to sue is broader than the consumer's, and not only in the sense that he can sue on their behalf or join in actions arising under the FCRISA. Unlike consumers, the Attorney General can sue without regard to whether the violation caused injury—an entire category of cases in his exclusive domain.[2] *See* N.M. Stat. § 56-3A-5.

The State contends *Nova Health* ought to be applied beyond its facts, to any case

---

[1] The threat of injury may be negated by the government defendant's renouncing any intention to enforce the challenged law. *See Winsness v. Yocom*, 433 F.3d 727, 729, 732 (10th Cir. 2006) (a political candidate who had defaced state and federal flags had no standing to challenge Utah flag-abuse statute where district attorney stated he had no intention of prosecuting candidate under the statute); *D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2004) (a Utah resident who had engaged in sodomy lacked standing to challenge sodomy law in light of the government's assurances of non-prosecution). That has not happened here.

[2] A favorable decision against the Attorney General would probably have preclusive effect in New Mexico state courts. Under New Mexico law, issue preclusion bars re-litigation of the same issue if "(1) the party to be estopped was a party to the prior proceeding, (2) the cause of action in the case presently before the court is different from the cause of action in the prior adjudication, (3) the issue was actually litigated in the prior adjudication, and (4) the issue was necessarily determined in the prior litigation." *Ideal v. Burlington Res. Oil & Gas Co. LP*, 233 P.3d 362, 365-66 (N.M. 2010). Assuming CDIA prevails in federal court on its preemption claim (an issue actually litigated and necessarily determined), issue preclusion would seemingly require a New Mexico state court to dismiss any subsequent enforcement actions brought by the Attorney General (the same party to the prior proceeding with a different cause of action).

- 10 -

where the relief sought does not completely redress a discrete injury. But *Nova Health* cannot bear the weight of such a broad interpretation, and even if it could, subsequent panels of this Court have not construed the decision so broadly. *See, e.g.*, *Edmondson*, 594 F.3d at 773-74 (Hartz, J., concurring and dissenting) (reading *Nova Health* as stating the basic proposition that potential for relief must rise above speculative level); *Habecker v. Town of Estes Park, Colo.*, 518 F.3d 1217, 1225 (10th Cir. 2008) (same).

The most telling clues about the limited reach of *Nova Health* are found in the decision itself. To illustrate the difference between a nominally public defendant and a proper defendant—that is, between a public official who stands in the same position as a private litigant and a public official who possesses special enforcement authority—the *Nova Health* court cited favorably to suits against state defendants with special enforcement powers. *See Corporate Health Ins., Inc. v. Tex. Dep't of Ins.*, 215 F.3d 526, 532 (5th Cir. 2000) (abrogated on other grounds); *Mobil Oil Corp. v. Attorney Gen. of Va.*, 940 F.2d 73, 74-75, 76 n.2 (4th Cir. 1991). Yet in both *Corporate Health* and *Mobil Oil*, the state defendants shared enforcement authority with private litigants, with the result that favorable decisions against the state defendants could only partially relieve the plaintiff's injury, the threat of private suits still extant. In other words, in offering examples of redressable lawsuits, the *Nova Health* court cites two decisions whose facts were analogous to those here. Had the *Nova Health* court intended to state the novel proposition that the injury must be completely redressable by the requested relief, it presumably would have relied on cases where the suit could completely redress the

- 11 -

injury.

There are also several decades of Supreme Court precedent counseling against a broader reading of *Nova Health*. Under these precedents, redressability is satisfied when a favorable decision relieves *an* injury, not every injury. *See, e.g., Massachusetts v. EPA*, 549 U.S. at 526; *Larson*, 456 U.S. at 243 n. 15. The State tries to avoid this line of precedent by adding a gloss of its own: A favorable decision, the State argues, need not redress every injury so long as the injuries it does redress are redressed completely. Setting to one side the difficulty in applying such a rule (is the threat of multiple lawsuits a single discrete injury or a number of separate injuries?), the State cites no authority for this theory, and neglects to account for *Massachusetts v. EPA*, where the Court adopted the contrary conclusion—standing is proper where a favorable decision would relieve "some extent" of an injury. 549 U.S. at 526. Indeed, if the law required that the requested relief afford complete redress, the Supreme Court would not have allowed Massachusetts to proceed against the EPA, as there was no guarantee a favorable decision would mitigate future environmental damage, much less redress it completely. Similarly, we would have dismissed the suit against the Attorney General in *Edmondson*, where the immediate and primary threat to the plaintiffs came from public employers, not the Attorney General. *See* 594 F.3d at 757.

To recap, federal courts have consistently found a case or controversy in suits between state officials charged with enforcing a law and private parties potentially subject to enforcement. *Doe v. Bolton*, 410 U.S. 179, 188 (1973). So long as the plaintiff

- 12 -

faces a credible threat of enforcement, redressability is generally not an obstacle, *see Edmondson*, 594 F.3d at 757, and our decision in *Nova Health* does not carve out an exception in cases where the state defendant shares enforcement power with private litigants.  CDIA therefore had standing to sue the Attorney General for injunctive relief.

B.  Whether CDIA has standing to seek declaratory relief against the Attorney General

The foregoing analysis applies with equal force to the question whether CDIA's request for a declaratory judgment presented a justiciable case or controversy.  The State contends a declaratory judgment against the Attorney General would not prevent private litigants from suing CDIA's members for violations of FCRISA, but if injunctive relief against the Attorney General meets the redressability requirement, the same must be true of declaratory relief.  *See Nashville, C. & St. L. Ry. v. Wallace*, 288 U.S. 249, 264 (1933) (holding that a controversy justiciable if presented in a suit for injunction is justiciable in a suit for declaratory relief).

To satisfy the 'case or controversy' requirement, a request for declaratory relief must settle "some dispute which affects the behavior of the defendant toward the plaintiff."  *Hewitt v. Helms*, 482 U.S. 755, 761 (1987).  Here, CDIA's members are faced with the imminent threat of the FCRISA's enforcement.  A declaration that the challenged provisions are preempted by federal law would redress the threat of enforcement in two respects:  directly, because once the declaration has issued, the court could issue follow-up relief to enjoin enforcement of the preempted provisions should the Attorney General decide to sue in state court; and indirectly, because the declaratory

- 13 -

judgment would have binding collateral effect in the New Mexico state courts, thereby frustrating a subsequent attempt by the Attorney General to enforce the FCRISA.[3] *See D.L. v. Unified Sch. Dist. No. 497*, 392 F.3d 1223, 1228 (10th Cir. 2004).

C. Other Justiciability Arguments

The State spends several pages of its statement of facts recounting justiciability arguments raised in its motion to dismiss under Fed. R. Civ. P. 12(b)(1) but not addressed in the district court's decision dismissing the case. Without further elaboration, the State incorporates these issues by reference in its argument section, contending they are implicitly at issue in any appeal raising a jurisdictional challenge.

We need not dwell on these issues. In the district court, the State offered evidence it describes as casting doubt on CDIA's standing. The evidence relates to several subsections of the FCRISA the State maintains are in harmony with federal law. It urges us to review the evidence and make the appropriate findings of jurisdictional fact. But that job seems better suited for the district judge, who has "wide discretion to allow affidavits, other documents, and limited evidentiary hearing to resolve disputed jurisdictional facts." *See Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001) (quoting *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995)). Indeed,

---

[3]A favorable decision could also benefit CDIA in FCRISA suits brought by consumers. Although a lower federal court's interpretation of federal law is not binding in state court, it is highly persuasive, and a federal decision that the FCRA preempts the challenged provisions of the FCRISA would carry significant weight in New Mexico state courts. *See State v. Cardenas-Alvarez*, 25 P.3d 225, 249 (N.M. 2001) (Serna, J., concurring); *Inv. Co. of the Sw. v. Reese*, 875 P.2d 1086, 1090 (N.M. 1994).

the challenged jurisdictional facts are so narrow that even if we decided them in the State's favor, remand would still be required because CDIA's standing would have been only mitigated, not eliminated. For instance, the State questions whether there is conflict between New Mexico and federal law with regard to issues like deadlines for responding to consumer requests or the type of proof required to trigger information removal, but omits mention of more notable conflicts—namely, the absence of a provision in the FCRISA giving CRAs the ability to deny an information block in the event they conclude it was improvidently granted.

Finally, the State makes cursory mention of a ripeness challenge, contending CDIA's suit is premature. But ripeness is seldom an obstacle to a pre-enforcement challenge in this posture, where the plaintiff faces a "credible threat" of enforcement, and "should not be required to await and undergo [enforcement] as the sole means of seeking relief." *See Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (quotation omitted); *Rocky Mountain Oil & Gas Ass'n v. Watt*, 696 F.2d 734, 741-43 (10th Cir. 1982).

For the foregoing reasons, we VACATE the judgment of the district court and REMAND the case for further proceedings consistent with this opinion.